at all, oral argument not to exceed 20 minutes to be shared by petitioners, 15 minutes for respondents and 5 minutes for intervener and CTA. Mr. Lay for the petitioners. Good afternoon, Mr. Lay. Good afternoon, your honor. May it please the court. Petitioners are dividing the argument by topic. I will address the FCC's preemption of fees like the city of Eugene's on non-cable services. I will also address the FCC's ruling that for franchise fee offset purposes, in-kind franchise obligation should be valued at fair market value rather than cost. Ms. Lienz, I will address the FCC's in-kind franchise rule and its mixed use rule. As noted earlier, I reserve four minutes for rebuttal. Very well. On the FCC's preemption of fees on cable operators or non-cable services, I start out by noting that fees like Eugene's apply both to non-cable operators and cable operators alike and they apply only to non-cable services, not cable services. They, therefore, are not franchise fees within the meaning of the act. The reason is that they are not imposed upon a cable operator solely because of its status as such. The FCC and NCPA nevertheless argue that because a cable system can be used to provide non-cable services, a fee imposed upon a cable operator's non-cable service is, therefore, a franchise fee. The problem with that argument, as the Supreme Court of Oregon noted in the City of Eugene v. Comcast, is that it writes the phrase based solely on its status as such out of the definition of a franchise fee. If there were any doubt about that, about that being the proper construction of the definition, the conference report to the 96 Telecommunications Act removes it, addressing the very question. It states telecommunications services, including those provided by a cable company, shall be subject to the authority of a local government to manage its public right-of-way and charge fair and reasonable fees. Mr. Ley, if I could just ask you kind of just a factual question, really. Do you know, does the record before us include any information about the market situation, so to speak, in Eugene? In other words, are there providers of, say, broadband services who are not providing those services by way of a cable system but instead are doing it some other way? Yes, Your Honor. There are what are known as competitive local exchange carriers that provide broadband service. The incumbent local exchange company provides broadband service. And how do they provide that? By wireline. I was about to say, the 7% fee only applies to wireline service providers, providers who have lines up and down the city streets. It has a separate scheme for wireless providers, which was sort of demanded by the FCC's rules of a per-spot, per-location fee. Okay, so if you provide, say, broadband services by means of a wireline, then the City of Eugene 7% fee applies. That is correct. And, again, I mean, so what proportion of those providers, again, to the extent the record tells us, what proportion of those wireline broadband providers are cable operators? You know, the wire in question is part of a cable system. I don't think the record provides that answer to that question. Comcast is, I believe, the only cable operator in Eugene. I believe it is. All the other providers, I don't know exactly how many competitive carriers there are. There are several. So in terms of pure numbers, there are more non-cable operators than cable operators. That is probably not true in terms of revenues. Okay, thank you. So that being the case, then, Mr. Lay, Comcast would be paying a 5% franchise fee based on their cable revenues. And they would be paying whatever the additional fee is. I think you said 7% that the other carriers that don't provide cable are paying. But it's all for the same right-of-way. It's the same cable in the same right-of-way, correct? That is correct, Your Honor. So why does it make sense to have, in your example, Comcast pay 5% of something plus 7% of something when its competitors are paying 7% of something? Well, actually, the reverse is true, Your Honor. Let me begin with a proposition. First of all, the Cable Act allows value-based right-of-way compensation, 5% of gross revenue-based fees, not cost. Second of all, this Court, in TCG Detroit v. City of Dearborn in 2000, ruled that the phrase fair and reasonable compensation under Section 253C of the Act for telecommunications providers can be gross revenue-based fees. So in this circuit, gross revenue-based fees are allowed for both. Under a gross revenue-based scheme, the value is measured by the total revenue derived. In your example, Comcast, the Cable Act allows it to itemize and recover from its cable subscribers its cable franchise fee. If it were immune from the telecom right-of-way fee for its non-cable services, that would mean, having recovered all of its cable franchise fees from its cable subscribers, it would be able to provide broadband service, for instance, free of any gross revenue charge, while all of its competitors do have to pay a gross revenue charge. That's basically giving the cable operator an advantage. So if I could just follow up on that, whether you separate it out on a bill or not, like a cable company can, surely you're not saying that the subscribers to broadband in a non-cable system aren't paying for a part of the overhead which includes the fee, are you? They're just not being told that they're paying a part of it. Well, no. I mean, cable operators itemize the 5% fee on their cable subscriber bills. If you were, for instance, a Comcast broadband subscriber and didn't subscribe to Comcast cable service, for instance, and there are growing numbers of those now, you would pay a 7% fee. You would pay no 5% fee because you're not getting cable service. And in that sense, you would be paying 7% on your broadband bill, just like another customer down the street who's using another broadband provider would pay 7%. So you'd be paying the same. These fees are, in fact, itemized on the bills. Operators uniformly do that because they like to tell subscribers how much they're paying goes to the government. But to use your example, it's not double paying any more than if you had a shopping center with gross revenue-based fees for its tenants, which is quite common, that you require a tenant to pay at an apartment store to pay not just a fee rent based upon the gross revenues from shoe sales, but also shoe sales from shoe sales and suit sales and tie sales and shirt sales as well. Mr. Lake, I just don't have it handy. Can you give me the relevant language of the Eugene ordinance that imposes this wire fee? I mean, you say it's a fee of general application. I don't doubt that. But do you have the language handy? I don't know if I have it handy. It applies to providers of telecommunications services with facilities in the rights of way. For Eugene's purposes, it defines telecommunications services more broadly than the Federal Communications Act to include broadband. Okay, I'm really looking, I mean, really for the words that define the conduct basically that trigger the application of the fee. I mean, I think that the words really matter here in determining whether the city is imposing this in, you know, in some manner of general application or is instead imposing it somehow upon cable operators, quad cable operators. Well, in fact, I will tell you that the language specifically excludes from the definition of telecommunications services, cable services, so that if you're providing only cable services, you're not even subject to the ordinance at all because you're not a telecommunications service provider. Okay. Okay, Mr. Lay, you're out of time. You've got four minutes for the bottle. You could use part of it now or you could reserve it. I'll reserve it. Thank you very much. Okay. All right. Let's hear from the city of Portland. Good afternoon, Your Honors. Cheryl Leganza, and I'm here to cover the in-kind rule and the mixed-use rulings. We have enough time to do that. So, the FCC's definition of the franchise fee, the broad scope of it, violates the statute and is inconsistent with the statute's goals. In order to illustrate the flaws in the FCC's reasoning, I'd like to focus on institutional networks, which are the non-residential portion of the cable system that serves businesses, office buildings, that carries data. And to be clear, local franchise authorities have jurisdiction over that part of the system, both for build-out and a separate authority to reserve capacity for educational and governmental use. Now, the FCC says that what they called build-out, they meant residential build-out, was not part of the franchise fee. Therefore, it was not counted against the cap. However, the FCC said the non-residential part of the cable system, the institutional network, was completely within the franchise fee and thus counted against the cap. Now, in order to do this, the FCC, in this case, didn't stick with the franchise fee definition and its exceptions. It went out and looked at the broader terms of the Act, and the provision it relied on said that the installation, construction, and maintenance of the cable system is the financial responsibility of the cable operator. Now, if that is your guidepost, if you apply it consistently, virtually everything that the FCC included in the franchise fee does not belong there because it's all part of the cable system, it's all owned by the cable operator, and it is not an assessment. So, can you just remind me, what is the relevant provision for the INET that we're talking about here, you know, provision of INET services pursuant to a franchise agreement? Right. So, there's two provisions, Your Honor. The definition is in 531F. Okay. And there's also a provision in 541, I believe it is BD3, that discusses, wait, let me just check, yeah, B3D, that confirms the franchise authority jurisdiction over the build-out of that network. Okay. All right. You can go ahead. Okay. Okay. I didn't want to interrupt your question, Your Honor. So, if the FCC is going to be consistent in applying the Act, which it must be, it cannot distinguish accurately the elements that it included within the franchise fee from the elements that it included from the franchise fee. I don't quite follow that, what you're saying there. I'm sorry. No, that's fine. So, the FCC said we can tell whether, for most cases, the FCC limited its analysis to just the G2 exceptions. If it's listed in the exception, it counts. If it's not, it's not. Right. I get that. Right. So, when we got to build-out, they did something different completely. They decided to… Okay. So, I guess on that point, it seems to me that perhaps they have a good reason, which is that they, as I understand it, they are flagging various obligations that are imposed directly, that are mandated by the statute itself. And they're saying those are not franchise fees because those obligations are imposed by the statute and not as a matter of negotiation discretion on the part of the LFA imposed by a franchise. You know, it's a franchise fee, which seems to capture obligations that the LFA chooses to include in the franchise, and these aren't among them because they're kind of meta obligations imposed by the statute. What's wrong with that? Well, with respect, Your Honor, the FCC found the opposite. In the first order, which was upheld by this circuit in the Alliance case, the FCC found there is no mandatory build-out. Just tell me why you think it's wrong. I'm not really looking for a history of the orders right now. Just as a matter of statutory interpretation, what is wrong with what I just described? As a matter of statutory interpretation, build-out is not mandatory. There's no level of build-out that's mandatory. The FCC has said this, Your Honors, the Sixth Circuit has confirmed it. Moreover, there's no distinction between the residential portion of the cable system. Under the law, under the definition of cable system in the Act, there's no distinction between the residential provision and the non-residential provision. There is a statutory mandate to provide service everywhere, regardless of income level of the residence, right? So the red line provision, there is not everywhere, though. It may not discriminate, Your Honor. And the FCC, I really encourage Your Honors to look at the Alliance case at page 781. Believe me, we've looked at all this stuff. I think, I mean, come on, there is a provision in subchapter six that says that they must provide service regardless of income level of the residence. And that is a statutory mandate, right? Correct. But what often happens is a local franchise authority, for example, and particularly these apply for new competitors as well as longstanding incumbents, you can authorize service in a relatively small area, as long as it doesn't discriminate based on income. Or you could authorize service in an extremely large area, and it could discriminate against income. That's a little bit to the side of what I'm getting at. What I'm getting at is, as I recall the FCC's order, the costs associated with complying with that statutory mandate that I described are not considered to be franchise fees, right? I mean, yes or no would be a good start, and then we can go from there. Partially, the FCC distinguished residential from non-residential. So, yes. I'm talking about residential. Okay, but they're all part of the cable system, Your Honor. I know Your Honor really believes that there was a mandate. Okay, anyway, go ahead. Okay, there is not a mandate, and I refer you to Alliance to say that there is not. For that reason, the FCC's distinction, the FCC says some things are, if you want to use, you know, the inherent part of the franchise, these are also inherently part of the franchise. The FCC cannot take certain parts of the franchise out and elevate them when the Act treats them all the same. I want to draw your attention to that provision 251, I'm sorry, 541A2 that says installation, construction, and maintenance is responsible of the cable operator. That's the operative language according to the FCC. And therefore, it doesn't distinguish the way the FCC wants it to, nor does it distinguish how, with regard to the same, as it was, sorry, in the state denial order. I will just spend a minute on the mixed use rule. I wanted to draw Your Honor's attention to the text of the rule that was codified. It's in the last page of your statutory appendix. It's 47 CFR 76.43. Virtually every word in this provision violates a statutory provision. What paragraph in the third order are we talking about? We're talking about the codified rule, which is in the appendix. In the CFR? In the CFR. 47 CFR 76.43. That rule says that franchise authorities are limited to cable service. However, we see in the Act, if you look at 541D2, states have broad authority over communication services that are not cable services. And we outlined in our brief on pages 47 and 48 the number of services that local franchises have authority over. There's a similar issue with regard to franchise systems with equipment, franchise systems and equipment, which is in 544B1. And I do see that my time is up, so I'd be happy to answer questions about mixed use rule if Your Honor's wanted otherwise. Are there any further questions, Judge McKeague? Could we take a 30-second break, Judge Griffin? I'll be right back. Sure. Thank you. Thank you. All right. Do we have Judge Kethledge? Yes. Ready to go. All right. Do you have a question, Judge McKeague? I did not. Okay. Question, Judge Kethledge? Oh, no, I don't for Ms. Lianza. No, I do not. All right. Well, thank you. Mr. Flood, or Ms. Flood, I'm sorry. Ms. Flood. Thank you, Your Honor. May it please the Court, Maureen Flood for the Federal Communications Commission. Before I start my presentation, when I refer to provisions in the Act, I'm going to use the Cable Act numbers. They'll be the 600 series versus the Communications Act numbers. Must you do that? I mean, because we're all… You want me to do that? I can do it. I can do it. Yeah, we're all using USC on this. Right, the USC. Okay. Yeah, thank you. You're welcome. The layperson, you know. No, it's fine. It gets confusing. Title VI of the Communications Act establishes the basic terms of a bargain between a cable operator and a franchising authority. A cable operator may apply for and obtain a franchise to use access to the right of way to construct a cable system. And in return, a franchising authority can impose fees and other requirements on the cable operator, but only as the Act allows. In the order I reviewed, the Commission did two things. It addressed two important aspects of this relationship. First, the composition of the franchise fee that the cable operator pays for its use of the rights of way. And second, franchising authorities' ability to impose fees and other requirements on cable operators' non-cable services. So, the Act defines a franchise fee as any tax-sphere assessment of any kind. And as this Court has already recognized, that broad language can include non-monetary assessments. On remand from this Court, the Commission reaffirmed its position and provided more explanation for its position that cable-related non-monetary assessments in franchise agreements fall within that definition for the most part. Nothing in the broad definition of franchise fee excludes all cable-related non-monetary assessments. And defining them as franchise fees is consistent with Congress' goal to limit the amount of franchise fees paid by cable operators. The Commission also relied on express authority in the Act to preempt state and local laws that make a cable operator pay a second fee or obtain a second franchise for buying non-cable services. Because the Act expressly bars franchising authorities from regulating a cable operator's non-cable services, the Commission determined that state and local laws that make a cable operator pay a second fee or obtain a second franchise for buying non-cable services should not be subject to the law. The Commission also recommended that state and local laws that make a cable operator pay a second fee or obtain a second franchise  for buying non-cable services should not be subject to the law. Yes, so this provides, except as otherwise permitted by Sections 531 and 532. 531 is the INAT requirement that Ms. Leonza was talking about. A franchising authority may not require a cable operator to provide any telecommunications services or facilities other than institutional networks as a condition of the initial grant to the franchise, a franchise renewal, or a transfer of a franchise. So that's telecommunications services. Let's say, what does that have to do with their ability to charge a generally applicable broadband fee? I don't see anything, any overlap with that. Because that provision and then also Section 544B1 prohibit a franchising authority or state or locality from imposing requirements on the cable operator's non-cable services. Right, let's just slow down for one second because this is a tricky little provision. It says, in its request for a proposal for a franchise, it cannot establish requirements for other information services. Well, okay, so that's obviously talking about a situation where the LFA is using its leverage as a franchisor to impose on a cable operator requirements with respect to other kinds of services. Isn't that fair? That's what this is getting at. It would seem not to get at a rule of general application which is applied to anyone who engages in certain kinds of conduct or business and is not imposed on a cable operator, qua cable operator. Well, Your Honor, the statute does not provide. The only thing petitioners have to point to for this cable operator as a cable operator, only when a cable operator provides cable services, is the language in Section 622B. And there it talks about imposing a fee on a cable operator based on its status as such. But that's ambiguous. It doesn't say a cable operator when it's providing cable services. As we point out in the order, cable operators do more than provide cable services. A cable system is a mixed-use system. And even the definition of cable operator provides that a cable operator also manages and operates a cable system. So solely based on its status as such is better read to provide a cable operator as the holder of a cable franchise that it can then use to provide cable and non-cable services. Well, true. It could provide broadband over that system. I think that's common ground here. But I guess just to step back, I mean, if we're going to the preemption issue here, to step back, I mean, starting with Section 544A, it conspicuously does not say that an LFA may regulate cable operators, quad cable operators, only as authorized by this act. It doesn't say that. It says that the LFA may not regulate the services, facilities, equipment provided by a cable operator, except to the extent consistent with this subchapter. So it's not saying, you know, they can regulate as authorized by the subchapter. They can regulate as consistent with the subchapter. And that's the same kind of language, consistent with used in the preemption provision itself. And so I would suggest, at least as I'm reading this, when you make a preemption argument, you need to point to a specific provision that basically is violated or circumvented by the LFA's imposition of some fee or requirement, rather than say Title VI doesn't expressly authorize the LFA to do this. I don't think that's a question. Is the LFA in some manner violating a provision of Title VI when it does this? Right. So, Your Honor, they are violating, as the commission explained in the order, they are violating the prohibition in Section 541D3B, as well as the prohibition in Section 544B1, that franchising authorities cannot impose requirements on cable operators, not on cable services. So when – But B1, B1 is talking about a situation where the requirement is in a franchise agreement, which it's not, for example, with the City of Eugene fee. It has nothing to do with their franchise. It has zero to do with their proposal for a franchise. Your Honor, Section 636C, within its scope, preempts not just franchise requirements that are inconsistent with the Act, but also state and local laws that are inconsistent with the Act. So the City of Eugene is imposing – Right. The City of Eugene, under its local law, outside of Title VI, is imposing a franchise requirement, like a second fee, that's inconsistent with the Act. It is preempted. It falls within the state and local laws. But, you see, I'm hung – To demonstrate inconsistency, you have to tell me what section the fee is inconsistent with. I would suggest it's not inconsistent with B1, because B1 could care less about state laws. B1 is saying you can't put certain things in a request for franchise proposals. You can't put certain things in there as requirements. You can't mandate those as anyone who's going to provide this service in our community. You've got to do these things. So you can't have anything in there about broadband. That's fine. But Congress chose to limit this, obviously, to the terms of a franchise proposal. And this is not – So this isn't violated by some generally applicable state law that lands on cable operators as well as other people. It would seem like. Your Honor, the first part of Section 636C, which preempts state and local laws that are inconsistent with the Act, would have no effect if Section 636C only preempted franchise requirements that are inconsistent with the Act. So, in other words, if petitioners are right and Section 636C only preempts them when they're acting within the bounds of Title VI and they're acting as a franchising authority, then the preemption of inconsistent state and local laws in Section 636C has no effect. And here what Congress did was it included inconsistent state and local laws outside the franchising process in Title VI because it wanted to prevent state and local governments from doing indirectly what they were prohibited from doing directly. Where did you come up with that? You made the statement Congress wanted to do this. Where is that in the statute? It's evidenced by the language of the statute, Your Honor. What language? I mean, I'm a textualist. I look at the text of the statute. And I know you argue policy and intent and legislative history and all that, but that's really not the way I construe statutes. I construe statutes consistent with the text of it. So tell me what in the text. I will look to the text, and I keep referring to the text, Your Honor, in Section 636C. And it says, except as provided in Section 557 of this title, any provision of law of any state, political subdivision, or agency thereof, or any franchising authority, or any provision of any franchise granted by such authority, which is inconsistent with this chapter, shall be deemed preempted. That doesn't say anything. It has to be inconsistent with the subchapter, though, which means you've got to tell me, you know, what provision of the subject chapter is the one, you know, with which the fee is inconsistent. I haven't heard it either. That's my problem. Right. Okay. So back to 636C, and this will be like my final crack at it, Your Honor. One last shot here. You're doing fine. Don't worry. Okay. Here's my last chance, and then I'll move on to the conflict. Our point, Your Honor, is that if the inconsistency had to be between a decision or an action taken under Title VI with a provision in Title VI, then there would be no need to also preempt any provision of any law of any state or political subdivision. So what Congress did there, the way that that provision works is it preempts not just actions taken under Title VI that are inconsistent with Title VI, but actions taken outside Title VI. Yeah, I mean, that's a conclusion, but I don't see any support for your conclusion. You can say conclusions all day long, but that doesn't mean much to me. On the preemption issue, I'm a little concerned about the D.C. Circuit case of Mozilla Corporation versus the FCC, and I know that you and counsel for MCTA say there's no conflict, but I'm not convinced. Well, tell me why there's not a conflict. There is preemption here while the D.C. Circuit in Mozilla ruled that the preemption ruling by FCC in that case was contrary to law. Sure. This is an express preemption case, Your Honor. Our preemption is founded on Section 636C of the Act, and we have found a conflict between the City of Eugene fee and specifically another second franchise fee and second franchise requirements with specific provisions in the Act, which are 544B1 and 541B3D. Sorry, I'm used to doing this. That's OK. But anyway, this is an express preemption case. So we have an express preemption provision, which is Section 636C, and it's in conflict with specific provisions in the Act. In Mozilla, we preempted based on this general federal policy deregulation, and so the D.C. Circuit said you can't preempt on sort of the general policy, and moreover, because you have renounced authority over broadband services, you can't then assert non-existent authority to preempt. So here we have statutory basis for what we're doing, and that was not the case in Mozilla. OK, well, let me ask you a question then. I mean, so you invoke 541B3D as one of the provisions that the City of Eugene fee conflicts with. Is that correct? That's correct, Your Honor. OK, and so that provision 3, whatever it is, I mean, 3D, that says a franchising authority may not require a cable operator to provide any telecommunication services or facilities. We can just end it there for our purposes. Or as a condition of the initial grant of a franchise or a renewal, right? So LFA cannot require them to provide any telecom service or facilities. I have no idea how this fee has the effect or purpose of requiring a cable operator, requiring them to provide telecom services pursuant to a franchise. Your Honor, two points. The first point is the commission interpreted the restrictions on franchising authorities' ability to regulate cable or telecommunications and information services in the Act to mean that they cannot regulate those services outside the franchising process. So you can't do outside, but you can do inside. I'd like to point one thing out. OK, so my question is, I mean, you invoked this language, right? And I'm reading it. And I'm telling you, if I'm wrong, I want to know. And I'm telling you, I don't see any conflict at all here between this particular provision and the CDUG 7% fee. May I make one clarification, Your Honor? Sure, of course. In the order, the commission preempted two types of requirements. One, the first requirement, the one that we've been talking about, are duplicative fees, where the locality, like the state regime says, you have to pay twice. The commission also preempted requirements, local laws, local provisions, that would require a cable operator to get a second franchise. So right as a franchise provides cable service, it's using the franchise cable system to provide cable and non-cable services. But then it requires the cable operator to get a second franchise. I understand, Your Honor, that you don't see fee in Section 541G3. But arguably, when you're talking about facilities and services, there is an inconsistency between that provision and then requiring a cable operator to go out and get a second franchise, right? It requires the provision of facilities and services. I just don't get it. You can't require the operator to provide telecom services. So Eugene is not requiring anybody, any cable op, Comcast. They're not saying you must provide telecom services. That's what this is after. Anyway, I don't want to belabor it. Ms. Flood, just for clarification, under the city of Eugene's ordinance, in connection with charging that 7%, do you have to have a second franchise, as you're alluding to, in order to provide the services to which the 7% applies? I don't know the specifics of that, Your Honor, because what the commission did is it didn't just preempt the city of Eugene. It more broadly said it's inconsistent with the act to require a cable operator to get a second franchise or pay a second fee. That swept in the city of Eugene fee broadly for preemption purposes. But I don't know the specifics of the fee. I don't know if Eugene also requires the cable operator to get a second franchise. You're saying it got swept in through paying a second fee regardless of whether that came as a result of a franchise? Correct. There are two different requirements. Thank you. I got it. I understand. Thank you. Can I make one last clarifying point in response to Judge Cuthledge? Is that okay? Yeah, please. I may have one more question if Judge Griffin doesn't mind. Sure. We've been talking a lot, Your Honor, and we've been focusing on Section 521D through B and the fact that it talks about, through the franchising process, a franchising authority can't make the cable operator provide telecommunications. I draw your attention and the Court's attention to 544B1. This is where franchising authorities are barred from imposing requirements on information services. And the statutory language says, but may not, except as provided in some Section 8, establish requirements for video programming or other information services. So there, the language is broader. And that seems to, you know, that would seem to bend. No, I totally get that. But I think that, granted, this is saying in certain contexts you cannot, the LFA cannot require or cannot establish requirements with respect to, let's say, broadband. But, you know, we have to read the whole provision, all of the words, and not just like certain excerpts that are put in a brief somewhere. And this begins with, in its request for proposals for a franchise, which I think makes clear enough that this ban on establishing requirements for broadband services, so to speak, that applies in the context of requests for franchise proposals. And so it would not apply if, in some other context where, you know, hypothetically, a local government is imposing a rule of general application upon anybody who's engaged in a certain business, and that happens to include cable operators to some extent. It's not part of a proposal. In other words, it's not regulating them as cable operators. It's regulating them as people who are engaged in some kind of conduct that triggers the application of a rule. Your Honor, can I make two clarifying points? First of all, in the order, the Commission reasonably interpreted Section 544B1 to provide that if a franchising authority cannot require a cable operator to provide information services as a condition on a franchise, then it can't subsequently regulate the cable operator's services once it voluntarily provides them. In other words, you can't kind of come along once the cable operator decides to provide it. And moreover, there was evidence in the record, and it's buried in one of the 600 footnotes, that oftentimes franchising authorities will go to the cable operator during the negotiation process and require the cable operator to voluntarily provide something so it can evade that restriction. Let's say, though, I mean, why isn't, I think, the city of, I think it's Eugene, I get to Portland. I mean, we've got two Portland cities here, so it's hard to keep them straight. But why isn't, I think, Eugene correct when they say, okay, let's look at B2B, which says that the LFA can enforce a requirement contained within a franchise for broad categories of video programming or other services. I mean, so why doesn't, so I mean, why isn't the right reading of these two provisions together that, look, the LFA can't make some requirement with regard to, say, broadband, a part of the franchise proposal, sort of a mandatory provision that nobody can evade. But if the parties negotiate and choose to include some broadband requirement as part of their deal, as part of the franchise, as part of the franchise as opposed to the franchise proposal, then go ahead and do it. Because, Your Honor, the commission reasonably read that interpretation to mean that you can't enforce, you can't enforce a requirement that you don't have the authority to impose in the first place. And again, there is evidence in the record that during the franchise process where, during the renewal process where the franchising authority has leverage over the cable operator, that the franchising authority was effectively forcing the cable operator to voluntarily agree to provide something so then it could enforce that voluntary commitment later. I just wanted to... Yeah, okay, I understand what you're saying. Yeah, and then one other thing. We haven't linked this to the statute, but I want to talk about that. Judge Kaplan, you and Your Honors have been talking about or characterizing the Eugene fee as a fee of general applicability, and Eugene and its group says, well, okay, look, so... Well, I'm not assuming that. No, okay, but Eugene... I said hypothetically. Okay, but we've been talking during our discussion today. The city of Eugene fee has been characterized at various points as a fee of general applicability. Okay, and Eugene and its group says, look, our telecommunications fee falls under the exception from the franchise fee definition for, this is 542G2A, okay, and this, excepted from the definition of franchise fee is any tax year assessment of general applicability. Yeah. So the reason, there are two reasons why this is not a fee of general applicability under the franchise fee definition. First of all, the commission in the first report in order explained that fees of general applicability are things like sales taxes, right? They're an entertainment tax. That's not what Congress said. I mean, let me cut to the chase. All right, on this one, let's say, forget about the Eugene thing. Let's say some other city, you know, Spokane, Washington, says anybody who offers broadband services in our community, you know, they have to pay a 7% fee of gross revenue, period. We could care less whether it's a wireline, whether it's a right-of-way, whether it's used by satellite, we could care less. Anybody engaging in this line of business, i.e. this conduct, has to pay a 7% of their gross revenue. Now that would seem to me just an archetype of a rule of general application. And so that would seem to me then actually not to be a franchise fee and not to be in conflict with anything in Title VI. Right, Your Honor. Here, though, the fees we're talking about are more limited. Do you agree? I know. I know. But that's not what we preempted. That's not Eugene's fee. Okay, I know it isn't. I'm not asking about Eugene's right now. Do you agree that that fee that I described would not be preempted? It would be preempted insofar as it was imposed on the cable operator for the cable operator's use of the right-of-way. It's not. They could care less about the right-of-way. It doesn't say anything about the right-of-way. Go ahead. Sorry. No, I'm sorry, Your Honor. No, go ahead. Okay. That would not be preempted because what we're talking about here is we're talking about use of the rights-of-way and that's the distinction. I remember at the beginning of Mr. Ley's presentation, we were asking him, what type of facilities are you talking about here? And Mr. Ley said, well, our fee only applies to wired broadband providers. In other words, the reason that they're imposing the fee is for use of the rights-of-way. No, I get that. I get that. And that's the difference. And so that's why this is not a fee of general applicability. And that's why the fee that they're charging cannot be inconsistent with Title VI of the Communications Act. I mean, Congress came in in 1984 and said, we are… Okay. Judge Griffin, can I ask one more question? You may. Because we're not going to have rebuttal from the FCC. On the valuation of in-kind cable services for purposes of the franchise fee determination. Yes. Just, I guess, to cut right to the heart of it. I mean, you say, well, we ought to do market value because that's what the LFA would pay if they weren't getting all this stuff for free.  But it seems to me that perhaps the FCC has its payors mixed up in that analysis. Because 522, 542 says that the… Obviously, the cable operator is the one who, quote, pays a franchise fee. And so the replacement cost for the LFA really would not necessarily seem to be germane. And we ought to be looking at what the cable operator is paying. And I guess I don't see why they're paying their profit that they would get on a market in addition to their out-of-pocket expense for providing the service, in fact, to the LFA. Well, Your Honor, it's a threshold matter, as we point out in our brief. Nothing in the statute prescribes a method for assessing fair market value. But it does tell us who the payor is. And then, you know, I'm suggesting that could lead to a cost answer. Well, Your Honor… Let's assume we're not at step two, in other words. Okay, I understand. But I think we have to get to step two because… Okay, let's assume we don't. Let's assume I disagree. There are two things. When it turns square on step one. Your Honor, so first of all, the primary reason that the Commission adopted fair market value was for purposes of administratability. I get that, yeah. But that's not a great interpretive answer, to be candid with you. Well, but Your Honor, the problem here is that if the Commission used cost, cable operators would have to perform cost studies to figure out the cost of each and every requirement. So you could assess, you could use that cost to… Yeah, well, that doesn't sound like putting a man on the moon, really. I mean, I'm sure they have a sense of what their costs are. Your Honor, respectfully, it is highly contentious because you have to, there are so many different ways that you can value cost. And what you're essentially doing is inviting further disputes and delay between these parties who are already at loggerheads. Okay, I get it. I mean, that could be the kind of thing where the agency actually could fill in the details, so to speak. You know, here's what counts, you know. But anyway, I really appreciate your patience in answering all the questions and so on, and I'll get out of the way. Okay, any further questions, Judge McKee? No, thank you. All right, thank you, Ms. Flood.  Ms. Ampson? Good afternoon, Your Honor. Thank you, Jessica Ring-Amundson for Intervenor and CTA. We thank the Court for moving forward with argument today. As we noted in our opposition to the motion to postpone, we believe these issues are ripe for resolution and hope that the Court's ruling will bring much-needed certainty to cable operators in their franchise negotiations across the country, given the many years that these issues have been pending. Okay, your position, these are issues of matter of law and that we don't have to apply Chevron deference? That's right, Your Honor. We believe that the Court can and should resolve these issues at Chevron Step 1 as to each of the three major orders. Okay, so even if the Commission down the road re-evaluates these, if this is what the law says, that's what the law says? That's correct, Your Honor. That's how we would urge the Court to resolve the case. I would just like to, I'll just briefly touch on each of the three major holdings and then would really like to address both the preemption ruling that you've been going back and forth about. So, first, you know, as to the franchise fee definition, the reason we think this can be resolved at Chevron Step 1 is that there would have been no reason for Congress to exempt from the franchise fee broad definition of any tax payer assessment of any kind to particular types of cable-related exactions if, in fact, as petitioners contend, all cable-related exactions are exempt. Second, as to the mixed-use rule, the FCC responded to this Court's order by showing the statutory basis for extending that rule to non-common carrier incumbents. And then, finally, the preemption… I'm with you on that, but I have trouble with the preemption issue. Okay. And I… Anyway, that's what I like to see. I'm very troubled by this preemption rule and whether it's authorized. Apologies, Your Honor, for interrupting. So, that's where, when Judge Kethledge was asking earlier, where is the conflict? The conflict is with the franchise fee cap. It's with the basic bargain that is set, which is that a cable operator gets access to the rights-of-way to operate a cable system. And in return for that right-of-way access, the cable operator pays at most 5 percent of its annual revenues on its cable services. So, that was the basic bargain. So, when we look at the… So, broadband services aren't cable services, are they? No, they're not. So, how does that violate that, to have an additional fee on the broadband? Because what the franchise authorizes… So, with the court's indulgence, I'll just walk through the various statutory provisions to show… Well, you might want to give me the quick answer. You only got two minutes, so… Sure. The basic bargain is 5 percent for right-of-way access to operate a cable system. A cable system is not just cable services. It incorporates both telecommunications and information services. But when Congress amended the Act in 1996, where before the Act had allowed actually recovery of up to 5 percent on all of the cable operator services, instead, Congress said, no, you only get 5 percent of cable services. And so, what a fee like the City of Eugene is doing is imposing 7 percent on top of the 5 percent that the cable operator is already paying for the rights-of-way. And I would note that Comcast also was required to obtain another franchise, which is in tension not only with 541B3D, but also with 541B3A and B, which preclude the franchising authority from requiring cable operators to obtain a second franchise to offer telecommunications services. Okay, but if the City of Eugene imposes a 7 percent tax irrespective of the cables in the ground, if it's applied uniformly to all internet providers, how does that conflict with this Act? Well, Your Honor, first of all, I would just step back and say, you know, information services, broadband services are fundamentally interstate services. So, the only interest that the City of Eugene has in regulating broadband services is in its rights-of-way. That would be the only jurisdiction. I don't know, but maybe the state could do it. The FCC's preemption order preempts all state laws, all municipal laws, and I can foresee taxes imposed maybe by the State of Oregon on all internet providers, and not necessarily specific to people that have cables in the ground, but all internet providers are going to be subject to a tax. Well, you're saying if you have internet through your cable, you can't be subject to anything else, and I don't see that necessarily being preempted, that's all. Well, I guess two answers, Your Honor. First, to start, I see my time has expired. Is it okay if I finish? Oh, sure, no. I'm concerned about this. Sure, Your Honor. So, starting with the text of 556C, which is the preemption provision, the broad preemption provision, and it preempts any provision of the law of any state or political subdivision. Right, but it has to be inconsistent with the subchapter of, you know, something in the subchapter. Which means it can't be, we can't do this wholly untethered to what the statute, what the subchapter says. We don't just start stepping back and saying, well, you know, well, they can't, you know, it's coming from another state or the commission has these broad goals. I mean, it's keeping us tethered to the statute, and that's where I'm struggling to see the conflict sometimes. So, Your Honor, with your indulgence, I will show you exactly how it's in conflict with the statute. Okay. So, what 542G2 says is that a franchise fee is any taxpayer assessment of any kind that is imposed on the cable operator solely because of its status as such. Now, how do we know what a cable operator is? Again, to the statute. You want a cable system. So, the state is the one who manages and operates a cable system. What does a cable system do? It provides not just cable services, but also information and telecommunication services. So, when you are imposing a fee on a cable operator for its use of the rights of way, Congress already told you what the price of that was. It's 5% of your annual cable-related revenues. The statute was amended to say it can only be your cable-related revenues, not all revenues that are gained from both. But that's a tax under the Act, and the argument is the 7% tax that Eugene has imposed is not a tax under the Act, that it's separate, it's independent, it's outside the Act. But that's exactly what the FCC was trying to prevent, Your Honor. Trying to prevent. I mean, that's the other thing. When you look at the overall intent and purpose and all this stuff, it doesn't do much for me. I mean, unless it is preempted by the words of the statute. I mean, the FCC has no authority to preempt state and local laws unless it is given that authority by Congress. And so you have to really point to a clear congressional authorization to knock out state and local laws. I mean, I think, if anything, the presumption is one of federalism, that state and local laws can exist with federal laws unless Congress has taken over the field, that's all. I'm just not convinced it has for this 7% tax. So, Your Honor, if I may, 556C is that broad preemption authority. You can say that as a conclusion, but I mean, give me some support. So, Your Honor, what a franchising authority can't do is say, I'm the city of Eugene, now I'm acting as a franchising authority. I know I can't impose a 7% tax on you when I have on my franchising authority hat, but I'm going to take off my franchising authority hat and put on my local regulator hat. Why can't they do that? Because that's exactly what the act says they can't do. They're not allowed to simply circumvent. Sure. I mean, well, I'll grant, personally, I would grant you that, you know, I mean, we can't have them circumventing provisions of the act. And when you cite that 2019 Supreme Court case for the proposition that conflict with means in a harmonious, that's frankly kind of what I think it brings that in, you know, attempts to circumvent. But I'm just not, I'm not so sure that some rule of general application, it depends on the facts. You know, I mean, the Spokane example I had, which I think Ms. Flood agreed was not preempted, you know, and it has nothing to do with wires or rights of way. You just provide this broadband in our community, you pay 7%. It's that simple. I don't see, I don't really see that as a circumvention of anything. Well, the city of Eugene tax was on the rights of way. No, I get that. And that's a different thing. I get that. I get that, Your Honor, that broadband is jurisdictionally an interstate service. So the only sort of interest that a state or local franchising authority would have in it is their sort of intrastate or intramunicipal interest. And that would be solely in the rights of way. They don't have an interest in, they don't have. Well, I mean, but this doesn't really have anything to do with a provision that we're looking at. I mean, that particular argument, the last thing I'd say, I understand your argument with respect to 542 G1, you know, that, hey, you know, a cable system. Everyone knows that as defined by the ACCA cable system, you can provide broadband services pursuant to a cable system. And so the operator is maintaining a cable system, which provides broadband. And I get your point. You're saying, well, hey, you can't, you can't, it's any fee imposed for the operation of a cable system. The broadband part of it, you know, maybe that's a double fee or maybe, you know, that counts as a franchise fee. I understand that part. But then we have the G2, which says, well, kind of notwithstanding the foregoing, I'm adding that part. Franchise fee does not include any tax fee or assessment of general applicability. And so, and so that's like a safe harbor. And if we determine it is that, and it's not some de facto targeting provision against the cable operators. So, you know, if it's neutral and it's not imposing the fee on them as cable operators, then that would seem to say it's not a fee. Your Honor, if I may, I would just encourage to read to the end of that exception, which is that any tax fee or assessment of general applicability. Not including one that is unduly discriminatory against cable operators and cable providers. Yeah, no, I know, but I don't see this. Well, okay, but not in the Spokane example. Not in the Spokane example. It's not. It's just, you know, anybody who does it. How is this unduly discriminatory? Because the cable operator has already paid the congressionally mandated price for access. That's for the cable services, is it not? It's not for the broadband? No, no, not at all, Your Honor. It's for a cable system, which is. For the use of the right-of-way. Cable service as well as broadband. So cable services, information services, telecommunication services are all operated over a cable system. All right, you're out of time. Judge McKeague, do you have some questions? No, I was just going to say you paid the 5% for the use of the right-of-way. You've already paid it. For the use of the right-of-way to operate a cable system, which includes not just cable services, but also information services and telecommunication services. Okay, very well. Any further questions, Judge Ketham? No, thank you for your arguments. We appreciate it. All right, Mr. Lay, you've got four minutes rebuttal. Thank you very much, Your Honor. I'll try to get to the point quickly. I didn't want to spend a lot of time on the franchise fee definition, Eugene, but I do have to correct a couple of things that Ms. Edmondson said. The fact of the matter is, the original Cable Act had a fee of 5% of gross revenue derived from operation of the system, period, all services. Then in 1996, Congress restricted the revenue base for the cable franchise fee to 5% of cable service. But it simultaneously enacted Section 253C, 253, 253C of which has a safe harbor for allowing franchising authorities, not franchising authorities. Is that the USC site? Yes, that is actually 253. That one actually is the same statute. It's in Title II. Preserving state and locality's ability to charge fair and reasonable compensation for use of the right-of-way to provide telecom service. The conference report addressed the very question and said telecommunication services, including those provided by a cable company, shall be subject to the authority of a local government. I'll just be honest. I don't really care about the conference. Okay. We don't care about legislative history. We might care about what the FCC said. The FCC said, in a footnote of its 2007 order, on its cable franchise fee rule, said that cable franchise fee rule, of course, does not apply to non-cable franchise fee requirements such as multiple fees related to the provision of telecom service. I don't really care about that either right now. I think we're focused on what's the right meaning of the words here and not some right of adverse possession to something that was wrong somebody said 10 years ago. Well, the question is, is that there's nothing in the Cable Act that authorizes a cable operator to provide non-cable services. Congress recognized that a cable system might be used for that. But the only thing Congress said about what a cable franchise authorizes is it says in 541B1 that a cable operator may not provide cable service without a cable franchise. That's all it says. It talks about cable service. And the first half of the cable operator definition is someone who provides cable service and a cable system. What section is that again, sir? Which provision? You have to have a franchise for cable service. That's 541B3, I think. Okay, I just want to be able to follow along. I think it's 541B3. All right. Also, I should tell you that, and I'm skipping a little here, the relevant provisions of the Eugene Ordinance you will find actually in the appendix to our opening brief at pages A33 through A36. Okay, so it is getting pretty close to the line saying if you use a wire line on a right-of-way. In the context of a gross revenue-based fee, it would be one thing if it were not a gross revenue-based fee. But if it's a gross revenue value-based fee, which this court has held is permissible for telecommunications right-of-way fees. Otherwise, you get in the situation where under the FCC's ruling, if a cable operator basically gets out of the cable business, but just provides a little bit of cable service and provides broadband for the same right-of-way, it pays nothing, virtually nothing, while its broadband competitor pays 7%. And that's exactly what Congress was talking about in the conference report and the FCC was talking about. If the goal is competitive neutrality, it is the FCC's interpretation that violates that principle, not Eugene. But if I may, I did want to move on to a couple of the other issues besides the preemption issue. And the first one has to do, I agree with Judge Kethledge, your remarks about fair market value. I will add that actually the Act and the FCC's rules support the cost argument itself. Beyond who pays, an argument I agree with, you'll find that Section 543, the rate-setting section, provides that the cost of franchise obligations will be included in the rate-setting process. In fact, 76.925 of 747 CFR is entitled cost of franchise obligations. It would be odd, the FCC's thinking seems to be for fee itemization purposes and rate-setting purposes, cost controls, but inconsistently for purposes of franchise fee offset purposes, fair market value controls. I would argue that's sort of an arbitrary and capricious distinction. You're out of time. Judge McKee, any further questions for Mr. Lay? No, thank you. Any further questions for Mr. Lay, Judge Kethledge? No, I just want to thank everybody for the excellent briefing and for their arguments and patience today. We appreciate it very much. All right, the case will be submitted.